COPY

1  SCOTT N. SCHOOLS (SCBN 9990)
2  United States Attorney

3  W. DOUGLAS SPRAGUE (CSBN 202121)    ORIGINAL
   Chief, Criminal Division                  FILED
4
5  STEPHANIE M. HINDS (CSBN 154284)        JUL 2 7 2007
   Assistant United States Attorney
6                                           RICHARD W. WIEKING
        450 Golden Gate Avenue, Box 36055   CLERK, U.S. DISTRICT COURT
7       San Francisco, CA 94102             NORTHERN DISTRICT OF CALIFORNIA
        Telephone: (415) 436-6816
8       Facsimile: (415) 436-6748
        email: stephanie.hinds@usdoj.gov
9
   Attorneys for Plaintiff
10
11              UNITED STATES DISTRICT COURT        **MMC**

12              NORTHERN DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,          )
                                       )  **C  No07  3874**
14                    Plaintiff,       )
                                       )
15            v.                       )
                                       )
16 REAL PROPERTY AND IMPROVEMENTS      )   **COMPLAINT FOR FORFEITURE**
   LOCATED AT 205 SE SPANISH TRAIL, BOCA )
17 RATON, FLORIDA ,                    )
                                       )
18                    Defendant.       )
                                       )
19 ─────────────────────────────────────

20 In this in rem forfeiture action, the United States alleges:

21                      **JURISDICTION**

22      1.      This Court has jurisdiction under Title 28, United States Code, Sections 1345 and
23
24 1355, Title 21 United States Code, Section 881 and Title 18, United States Code Section 981.

25                       **PARTIES**

26      2.      Plaintiff is the United States of America.

27      3.      The in rem Defendant is the real property and improvements located at 205 SE
28

**COMPLAINT FOR FORFEITURE**

                                                              *1*

Spanish Trail, Boca Raton, Florida, the residence of Michael Arnold (hereinafter "defendant real property").

4.     The defendant real property constitutes, and is traceable to, proceeds from the unlawful distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); it is thus subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6). In addition, the defendant real property constitutes property involved in, or traceable to, money laundering transactions, in violation of Title 18, United States Code, Sections 1956 and 1957, and thus subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

5.     The defendant property has not and will not be seized. Rather, the government will cause a lis pendens to be filed against the property in the state of Florida.

### VENUE

6.     Venue lies in the Northern District of California, pursuant to Title 28, United States Code, Sections1355(b) and 1395(a), as some of the acts giving rise to this *in rem* action occurred in this district.

### INTRADISTRICT ASSIGNMENT

7.     This matter stems from the unlawful sale and distribution of controlled substances via the internet to consumers throughout the United States, including consumers residing in south bay counties within the Northern District of California. This matter thus arises in the county of Santa Clara because a substantial part of the events which give rise to plaintiff's claims occurred in that county. In addition, the allegations set forth below are based, in part, on the investigation related to criminal action captioned *United States v. Andrew Russo, et al*, CR 06-00748 RMW, currently pending in San Jose. Accordingly, pursuant to Civil Local Rule 3-12 and Criminal

**COMPLAINT FOR FORFEITURE**

*2*

Local Rule 8-1, this matter should be assigned to the Honorable Ronald M. Whyte, United States District Judge, in San Jose.

## CONTROLLED SUBSTANCES ACT

8.     The United States Drug Enforcement Administration ("DEA") is the federal agency charged with the responsibility of enforcing the controlled substances laws and regulations of the United States.

9.     DEA is also responsible for, among other things, regulating the pharmaceutical industry, medical professionals, researchers, manufacturers, and distributors in complying with the Controlled Substances Act ("CSA"), codified at 21 U.S.C. § 801 et seq.  The CSA governs the manufacture, distribution, and dispensing of controlled substances in the United States.

10.    Pharmacies dispensing controlled substances are required to register with the DEA.  A separate registration is required for each principal place of business where controlled substances were distributed or dispensed.  A DEA registered pharmacy can engage in activities only as authorized by the state where the pharmacy was located.

11.    The CSA is the federal law that places all controlled substances into one of five categories, or schedules, according to the drug's potential for abuse, physical and psychological dependence liability, and current accepted medical use.  Various prescription drugs are scheduled substances under the CSA.  There are five schedules of controlled substances schedules I, II, III, IV, and V.  Abuse of Schedule III drugs may lead to moderate or low physical dependence or high psychological dependence. Abuse of Schedule IV drugs may lead to more limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule III.

12.    Title 21, Code of Federal Regulations, Section 1306.04(a) provides: A

COMPLAINT FOR FORFEITURE

prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

13.    Phentermine, a stimulant, is classified under federal narcotics laws as a Schedule IV controlled substance.

### STATE LAWS AND MEDICAL ASSOCIATION POSITIONS

14.    Many states have imposed requirements upon doctors and healthcare professionals to take certain steps before they could prescribe, distribute, or dispense controlled substances, including California and North Carolina:

### CALIFORNIA LAW

Business and Professions Code

Section 4110. (a) No person shall conduct a pharmacy in the State of California unless he or she has obtained a license from the board. A license shall be required for each pharmacy owned or operated by a specific person. A separate license shall be required for each of the premises of any person operating a pharmacy in more than one location. The license shall be renewed annually. The board may, by regulation, determine the circumstances under which a license may be transferred.

Section 4120. (a) A nonresident pharmacy shall not sell or distribute dangerous drugs or dangerous devices in this state through any person or media other than a wholesaler who has obtained a license pursuant to this chapter or through a selling or distribution outlet that is licensed as a wholesaler pursuant to this chapter without registering as a

COMPLAINT FOR FORFEITURE

4

nonresident pharmacy.

Section 4067. (a) No person or entity shall dispense or furnish, or cause to be dispensed or furnished, dangerous drugs or dangerous devices, as defined in Section 4022, on the Internet for delivery to any person in this state without a prescription issued pursuant to a good faith prior examination of a human or animal for whom the prescription is meant if the person or entity either knew or reasonably should have known that the prescription was not issued pursuant to a good faith prior examination of a human or animal, or if the person or entity did not act in accordance with Section 1761 of Title 16 of the California Code of Regulations.

Health and Safety Code

Section 11153. (a) A prescription for a controlled substance shall only be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. Except as authorized by this division, the following are not legal prescriptions: (1) an order purporting to be a prescription which is issued not in the usual course of professional treatment or in legitimate and authorized research; or (2) an order for an addict or habitual user of controlled substances, which is issued not in the course of professional treatment or as part of an authorized narcotic treatment program, for the purpose of providing the user with controlled substances, sufficient to keep him or her comfortable by maintaining customary use.

## NORTH CAROLINA LAW

21 NCAC 46.1801 Right to Refuse a Prescription

(b) A pharmacist shall not fill or refill a prescription order if the pharmacist actually knows or reasonably should know that the order was issued without a physical examination of the patient and in the absence of a prior prescriber-patient relationship, unless:
> (1) the prescription order was issued for the patient by a psychiatrist;
> (2) the prescription order was issued for the patient after discussion of the patient status with a treating psychologist, therapist, or physician;
> (3) the prescription order was ordered by a physician for flu vaccinations for groups of patients or members of the public;
> (4) the prescription order was for prophylactic purposes, such as the ordering of antibiotics by a pediatrician for members of a child's family when the child has a positive strep test;
> (5) the prescription order was an emergency order for medication related to

**COMPLAINT FOR FORFEITURE**

pregnancy prevention; and

(6) the prescription order was an order for medications to be taken by groups traveling to foreign countries.

21 NCAC 46. 1 805 Dispensing Drugs without a Prescription

The dispensing of or any delivery of a prescription drug, including the surrender of control or possession in any manner which results in a delivery of a prescription drug, without a valid prescription order is unlawful. Refilling a prescription for a prescription drug without authorization is unlawful.

21 NCAC 46.18 11 Excessive Dispensing of Prescription Drugs

Pharmacists shall not dispense and permit holders shall not allow a pharmacist to dispense prescription drugs at such a rate per hour or per day as to pose a danger to the public health or safety.

## MEDICAL ASSOCIATIONS

15.     The American Medical Association ('AMA") is the largest association of medical doctors in the United States. Its purpose is to advance the interests of physicians, to promote better public health, to lobby for medical legislation, and to raise money for medical education. Since at least 1999, the AMA publicly announced its position that a physician who offers a prescription to a patient solely on the basis of an online questionnaire without ever having examined the patient has generally not met the appropriate medical standards of care.

16.     The Federation of State Medical Boards of the United States, Inc. ("FSMB") is a national organization comprised of the 70 medical boards of the United States, the District of Columbia, Puerto Rico, Guam and the U.S. Virgin Islands.  On behalf of its membership, FSMB's mission is to improve the quality, safety, and integrity of health care through the development and promotion of high standards for physician licensure and practice.  Since at least 2000, the FSMB has recognized that Internet web sites permitting customers to obtain

**COMPLAINT FOR FORFEITURE**

prescription drugs without an adequate evaluation by a physician poses an immediate threat to public health and safety. As a result, FSMB has publicly announced its position that the prescribing of medications by physicians based solely on an online questionnaire fails to meet an acceptable standard of care and is outside the bounds of professional conduct.

## INTERNET PHARMACIES

17.    This case involves the unlawful distribution of controlled substances through internet pharmacies. These internet pharmacies generally operated as described below.

18.    Individuals that operated web sites to sell pharmaceuticals generally created an Online Pharmacy Affiliate Program ("OPAP") or joined an existing OPAP to manage their e-commerce business. OPAPs were simply contractual agreements establishing an e-commerce business to oversee the acquisition, sale and distribution of pharmaceuticals and other related products. OPAPs generally consisted of five (5) or fewer interested parties involved in an online transaction: (1) the customer; (2) an Affiliate site; (3) a Merchant site; (4) a Physician Network and; (5) a Pharmacy Network. OPAP maintained merchant web sites ("Merchants") to facilitate the sale of their products. OPAPs established accounting systems to receive and make payments; opened bank accounts to hold operating capital; recruited affiliate web sites ("Affiliates"), physicians and pharmacies; contracted for services provided by credit card and overnight shipping companies; purchased and/or developed and maintained sophisticated software to track all aspects of their business; and, provided Affiliates, Physician Networks and Pharmacy Networks with e-business assistance and instruction.

19.    Affiliate web sites were the web sites the customer first saw when attempting to purchase the OPAP's products. The customers do not purchase the pharmaceuticals from the Affiliate web sites, but were usually electronically re-directed to the Merchant site where the

COMPLAINT FOR FORFEITURE

purchase occurred.

20. Merchant web sites were the online stores from which customers ultimately purchased pharmaceuticals. These sites took the customer's order, collected the money via credit card or other electronic means, directed OPAP physicians to approve drug orders, fulfilled the orders through a Pharmacy Network and shipped the products to the customer. When a customer enters a Merchant web site and clicked to purchase an item, the Merchant web site prompted the customer to provide his/her biographical information, shipping information, payment method and a medical history in the form of an online questionnaire. The data provided by the customer was stored in a database that was accessible through a web-based interface by OPAP physicians who viewed and approved, and pharmacies that filled and shipped, pending orders.

21. A Physician Network used by the OPAP consisted of one or more doctors who were recruited and contracted by the OPAP to approve drug orders for customers ordering from the Merchant site. After the customer submitted a request to purchase pharmaceuticals, the Merchant site electronically stored the order details until the order was accessed by a network physician. The physician accessed the Merchant site's "back end" by providing his or her user identification and password. This "back end" consisted of a database and administrative tools that were not accessible to the general public. The physician subsequently reviewed the customer's request, clicked a box to approve the order and then clicked a button to submit the now approved order to the Pharmacy Network for filling.

22. An OPAP used one or more contracted pharmacies of a Pharmacy Network to fill a customer's drug order. Similar to the network physician, an employee of the network pharmacy accessed the Merchant "back end" site by providing a user name and password and then identified the orders that the pharmacy could fill and ship. Through web-based software, the

COMPLAINT FOR FORFEITURE

8

Merchant site generated a label for the pill bottle containing pertinent information about the consumer, the pharmaceutical, the approving physician and the participating pharmacy. The software also generated the appropriate pharmaceutical advisory/contraindication sheet and a shipping label bearing the consumer's name and address. Once the participating pharmacy filled the prescription, they packaged it, attached the preprinted shipping label and shipped it to the customer via

a commercial courier service, most frequently Federal Express or United Parcel Service.

## FACTS

23.    Plaintiff incorporates by reference the allegations of paragraphs one through twenty-two as though fully set forth herein.

### ARNOLD'S INVOLVEMENT IN DRUG TRAFFICKING

24.    Since at least 2003 and continuing to the present, Michael ARNOLD (hereafter ARNOLD), ("a.k.a.") "Mike Johnston", Pitcairn Group, ("a.k.a.") "Pitcairn Investments" , Echo International, S.A., Direct Connect International, S.A., Haven Technologies, Inc., Azure Technologies, S.A., Vsecure Networking, Inc., and others known and unknown to law enforcement, participated in a conspiracy to distribute Schedule III and IV controlled substances to residents in the Northern District of California and throughout the United States. ARNOLD laundered the proceeds from his illicit drug trafficking activities through the use and acquisition of real and personal property.

25.    This investigation was initiated in July 2005 after receiving a complaint from a concerned citizen in the Northern District of California that a close family member had purchased controlled substances from a Web site purporting to be an online pharmacy without first having a valid prescription and without having a pre-existing patient-physician relationship.

COMPLAINT FOR FORFEITURE

26.    Based on records reviewed from PayPal, DEA agents have traced ARNOLD's involvement in Internet pharmacies back to 2003. On April 21st and 22nd of 2003, ARNOLD purchased bulk e-mail software from Internet Marketing Solutions (imtware.com) that was designed to send bulk e-mail advertisements. The software purchases were made approximately four (4) months after ARNOLD filed for bankruptcy. ARNOLD sent two PayPal payments in the amount of $89.00 and $79.00 to Internet Marketing Solutions for the software. DEA Special Agent Jason Chin reviewed the imtware.com Web site and learned that the product "Prospect Mailer" was priced at $89.00 and the product "Prospect Finder" was priced at $79.00. According to "Prospect Mailer," this product "Turns your computer into a professional bulk email server." According to the product "Prospect Finder," this product "Crawls the internet collecting targeted email addresses." On May 3, 2003, ARNOLD registered the domain name pillsavings1.com through the domain registrar Go Daddy. Thirteen days later, ARNOLD sent a PayPal payment in the amount of $350.00 to ALS, a Web hosting company, for hosting the Web site pillsavings1.com. Seventeen days later, ARNOLD is believed to have purchased 70 million e-mail addresses from Mega Success. For the PayPal transaction, Mega Success used the e-mail address cf_childs@yahoo.com. SA Chin conducted an Internet keyword search on the search term "cf_childs" which revealed a posting that identified cf_childs@yahoo.com on the Slash Dot Web site (http://slashdot.org/it/03/03/19/1736249.shtml?tid=111) as being a spammer. ARNOLD continued to send PayPal payments to individuals suspected of selling millions of e-mail addresses and ARNOLD acquired servers in Romania, Brazil, Korea, Japan and China. On at least one occasion, ARNOLD purchased an item described as "Bulk-friendly Hosting Option 4" which was subsequently identified as a source of spam.

COMPLAINT FOR FORFEITURE

27.     DEA Special Agent Brandon Bridgers conducted an Internet keyword search on

the search term "pillsavings1" which revealed numerous Web sites that contained reports of

spam. SA Bridgers navigated to the Web site

http://www.electriceye.net/banned/domainview.asp?key=pillsavings1.com, which is a Web site

associated with audio and video editing. The Web page that SA Bridgers navigated to contained

a list of spam e-mail subjects that were associated with pillsavings1.com. According to the Web

page, pillsavings1.com was added to the sites banned domain list and further listed the following

subject headers and the date the messages were received:

                pillsavings1.com
                added 5/25/2003
                e-mail srec'd: subject received
                Slim and Beautiful anthem demerit dad slaughterhouse        5/25/2003
                Prescripti0n Privacy, Valtrex                               5/27/2003
                Prescripti0n Values, Phendimetrazine                       6/2/2003
                Prescripti0n Values, Tenuate                               6/3/2003
                Prescripti0n D1scounts, V1agra                             6/5/2003
                L0se We1ght,                                               6/6/2003
                0nline D0ctor Prescripti0ns                                6/10/2003
                Reduce Pounds Safely                                       6/13/2003
                She's In Shape                                             6/18/2003

28.     Special Agent Chin reviewed ARNOLD's bankruptcy filings which revealed that

ARNOLD's bankruptcy was discharged December 10, 2004, which was approximately one and a

half years after ARNOLD registered the domain name pillsavings1.com.

29.     During the course of this investigation, the DEA San Francisco Field Division

identified United Care Pharmacy (UCP) and Kwic Fill, Inc. as two brick-mortar pharmacies that

distributed, on multiple occasions, controlled substances to residents of the Northern District of

California, as well as other locations through the United States, via the internet, in violation of

federal and state laws.

**COMPLAINT FOR FORFEITURE**

30.    On or about November 15, 2006, a federal grand jury for the Northern District of California returned an indictment charging Andrew Russo, Denis Leborgne and others, with drug trafficking and money laundering offenses for their participation in a conspiracy to distribute and dispense controlled substances via the internet through their operation of United Care Pharmacy (UCP), in violation of Title 21, United States Code, Section 846.

31.    In furtherance of the conspiracy, Russo, Leborgne and others caused the controlled substances to be distributed and dispensed to customers without: an adequate patient history; performing a mental or physical exam; using appropriate diagnostic or Laboratory testing; or providing a means to monitor medication response, in violation of the federal requirements under the CSA, regulations set forth in the Code of Federal Regulations, and various state laws requiring that controlled substances be dispensed only for a legitimate medical purpose and in the usual course of professional medical practice.

32.    It was also part of the conspiracy that Russo, Leborgne and others, established a pharmacy and associated the pharmacy with an OPAP operated by other individuals to distribute pharmaceuticals as well as distributing pharmaceuticals for an OPAP operated by several members of the conspiracy to citizens of the United States, without requiring a face-to-face meeting or any consultation with a physician. The defendants obtained money from OPAP owners for distributing and dispensing drug orders obtained via the Internet. In addition, the defendants obtained money from customers through web sites that represented that a physician would review an online health questionnaire completed by the customer and issue a valid and lawful prescription that would be filled by a licensed pharmacy, when in truth and in fact, there was no meaningful physician review prior to approval, and no valid and lawful prescription was issued.

**COMPLAINT FOR FORFEITURE**

33.    Through a review of records obtained during the execution of federal search warrants and Administrative Inspection Warrants, in connection with this and other investigations, SA Bridgers learned of every online pharmacy affiliate program that contracted with UCP and Kwic Fill, Inc., to include Pitcairn Group, to fill their Internet drug orders. According to the information obtained from the execution of federal search warrants and Administrative Inspection Warrants, SA Bridgers reviewed a drug ledger maintained by UCP which showed that for the period of July 18, 2005 through February 7, 2006, UCP filled at least 116,974 orders for Pitcairn Group.

34.    As part of this investigation, from November 2005 through February 2006, DEA San Francisco conducted five undercover purchases of controlled substances from Web sites associated with Pitcairn Group. Specifically, undercover purchases were made from ezprescription.net (November 16, 2005), doctorrefill.net (December 1, 2005), prescriptiontrends.com (January 5, 2006) and ecomsmile.com ("a.k.a.") "ezdietpills.net" (February 27, 2006). All of the undercover purchases consisted of phentermine 37.5 mg, a schedule IV controlled substance. Once the undercover purchases were completed, DEA agents received e-mail communications with the status (order received, credit card approved and order shipped) of each order that were sent from an e-mail account with a domain name known to be controlled by ARNOLD. Each Web site referenced above were identified as Pitcairn Group sites based on the domain name registration to Juan Montes of Direct Connect International and the reference to the Echo International, S.A charge on the credit card statement (see paragraphs 35 and 51). In addition, toll free telephone number (800) 242-5942, which was identified as a telephone number controlled by Pitcairn Group, was listed on each of the Web sites. During each undercover purchase, no one, including the physician and pharmacy, called to verify that

COMPLAINT FOR FORFEITURE

the undercover DEA agents had a valid prescription.

35.    Special Agents Bridgers and Chin conducted a historical Whois query to determine the registrant for the Web site pitcairngroup.com. The Whois query revealed that as of September 21, 2005, pitcairngroup.com was registered to Juan Montes (hereafter Montes), under the organization name of Direct Connect International. E-mail address tech@dcpanama.com and phone number (507) 584-5556 was listed as the contact information for Montes. Based on information obtained via subpoena from PayPal, I identified e-mail address tech@dcpanama.com as an e-mail address utilized by ARNOLD and later determined that ARNOLD used the alias "Juan Montes".

36.    According to the PayPal information, ARNOLD logged into his Paypal account utilizing IP address 68.157.93.50. SA Bridgers identified the service provider of IP address 68.157.93.50 as Bellsouth. SA Bridgers subsequently issued a subpoena to Bellsouth requesting subscriber information for IP address 68.157.93.50 with date and time stamp of May 20, 2005 at 13:43:40 0400. The date and time stamp was identified based on e-mail communication discussed in paragraph 38. Bellsouth responded to the subpoena and provided that the subscriber to IP address 68.157.93.50 was ARNOLD at address 401 NE Mizner Boulevard, Boca Raton, Florida, which was identified as ARNOLD's former residence.

37.    DEA investigators from San Juan, Puerto Rico executed multiple federal search warrants on e-mail account valdiviesomd@yahoo.com. E-mail account valdiviesomd@yahoo.com was identified by DEA investigators as the e-mail account for Dr. Alfred Valdivieso (hereafter Valdivieso) who was a Puerto Rico based physician utilized by multiple Internet pharmacy operations, including Pitcairn Group, to illegally approve Internet based drug orders. Based on my analysis of the e-mail communications in the

**COMPLAINT FOR FORFEITURE**

valdiviesomd@yahoo.com account, SA Chin discovered several e-mail communications between

Valdivieso and Pitcairn Group relating to the recruitment of Valdivieso's physician services for

the approval of controlled substances via the Internet. SA Chin subsequently identified the

source of the e-mail communication from tech@pitcairngroup.com as originating from

ARNOLD.

38.     On May 20, 2005, an e-mail was sent from tech@pitcairngroup.com to

valdiviesomd@yahoo.com with a subject of "Online Reviewals." The e-mail included a time

stamp of 13:43:40 0400 and originated from IP address 68.157.93.50. As previously discussed in

paragraph 36, IP address 68.157.93.50 was subscribed to by ARNOLD at ARNOLD's residence.

The content of the e-mail communication was as follows:

> Hi Dr. Valdivieso!
>
> We were referred to you by Jeff Black and Barbara at Optimal Merchant.
>
> We have an existing online pharmacy and were looking for a new Doctor to review our patient's prescriptions. We use BackOffice, which you may be familiar with.
>
> Is there a good time we could contact you?
> We've heard good things about you and are interested in adding you as one of our reviewing Doctors.
> Sincerely,
>
> Mike Johnston[1]
> Pitcairn Group
> www.pitcairngroup.com

39.     On May 22, 2005, an e-mail communication was sent from

tech@pitcairngroup.com to valdiviesomd@yahoo.com with a subject of "Login Ready

---

[1]Based on information obtained from subpoenas and the analysis of IP addresses from the e-mail communication, SA Chin has identified Mike Johnston as an alias utilized by ARNOLD.

**COMPLAINT FOR FORFEITURE**

*15*

RE:Online Reviewals." ARNOLD informed Valdivieso that he (Valdivieso) was set-up in

Pitcairn Group's system and was ready to approve Internet orders. ARNOLD provided

Valdivieso with Web site www.pitcairngroup.com, username: avaldi and password:

sangerman683. ARNOLD also requested that Valdivieso provide him (ARNOLD) with

Valdivieso's bank information for future wire transfers.

     40.    On June 25, 2005, an e-mail communication was sent from ARNOLD to all of

ARNOLD's partners to include valdiviesomd@yahoo.com with a subject of "Email and IM

Communication." The content of the e-mail communication was as follows:

> Dear Partners,
>
> We are requesting all business partners and affiliates please setup and use
> a Free email account at:
> http://www.hushmail.com
>
> We will no longer be sending emails to USA mail servers that can be
> subpoenaed and compromised.
> Major ISP's like AOL, MSN, GMail, Hotmail will give your emails to any
> government agency requesting access to them and they will use that
> information against you, regardless of which country you live in the world.
>
> Hushmail servers are located outside of the USA and cannot be subpoenaed.
> (Canada, Anguilla and the UK)
> Mail stored at Hushmail is encrypted with your passcode and even if the
> server was compromised physically and even Hushmail Administrators cannot
> read your encrypted mail there.
>
> It is also important to encrypt email during transmission to your recipient.
> During Transmission, 80% of the world's traffic traverses the USA even if
> the recipient is not in the USA.
> The US Federal Government has taps at all of the major internet backbones
> and captures all email sent via SMTP and POP3.
>
> It is necessary to encrypt with PGP to retain privacy.
> Hushmail supports this automatically.
> Our PGP keys are installed at all Hushmail servers.
>
> Also, regarding Internet chat.

**COMPLAINT FOR FORFEITURE**

We will be using Skype primarily which is an Encrypted IM chat and non-USA, located in Luxembourg, London and Tallinn.
Please sign up for a Skype IM chat account to communicate with us.
www.skype.com

Our PGP emails:
tech@pitcairngroup.com

Our secure Skype chat:
dc_panama

Thank you for protecting your privacy!

Pitcairn Group

41.     On September 21, 2005, Valdivieso sent ARNOLD an e-mail communication

with the subject of "RE: Confirming." The e-mail from Valdivieso was in response to an e-mail

sent by ARNOLD requesting Valdivieso if he (Valdivieso) could "ask your PA's to login just a

bit more? We've switched over the majority of our patients to you." Valdivieso wrote in his

reply "Have heard the news. yahoo.news dea====they are cracking down on controlled meds. I

think we should not do any controlled meds. please let me know."

42.     On September 21, 2005, ARNOLD replied to the e-mail communication from

Valdivieso in paragraph 41. The content of the e-mail communication was as follows:

Hi Dr. V !

If you decide to stop processing consultations for controlled meds, can you please
give us 1 week notice in advance?
Please be fair with us regarding advanced notice.

We will be continuing as normal here.
This is somewhat normal this time of year and seems to happen every fall. They
seem to focus more on Schedule 2 and 3 items.
Only you can make a decision regarding your license, analysis of current law and
comfort level with your prescriptions.

Thank you,

**COMPLAINT FOR FORFEITURE**

Pitcairn Group

43.    On September 23, 2005, Valdivieso sent ARNOLD an e-mail with the subject of "Re: Secure Email." The content of the e-mail communication was as follows:

> It is an unfortunate situation, but it is a general understanding that the dea is targeting website that process orders for controlled meds without following medical records and a doctors consultation. By the way if my memory serves me correctly our agreement was for non-controlled???For that reason I have halted the processing of controlled meds.
>
> dr.v

44.    On September 23, 2005, ARNOLD replied to Valdivieso's e-mail communication in paragraph 43. ARNOLD requested that Valdivieso provide ARNOLD with at least one week notice before he (Valdivieso) stopped approving Internet orders for controlled substances. ARNOLD also informed Valdivieso that he (ARNOLD) needed Valdivieso to continue to help with the approval of controlled substances and non-controlled substances. ARNOLD wrote to Valdivieso "If you have really decided to stop completely, we'd appreciate 1 week notice so we can find a replacement. We'll make sure all outstanding balances are paid on time."

45.    Special Agents Bridgers and Chin analyzed the header files of the e-mail communications and identified several IP addresses and traced the path of the e-mail communications from tech@pitcairngroup.com to valdiviesomd@yahoo.com as previously discussed in paragraphs 38 through 44. The Special Agents then identified IP address 68.157.93.50 as the originating IP address for the e-mail communications from tech@pitcairngroup.com. As referenced in paragraph 38, SA Bridgers and I identified IP address 68.157.93.50 as a static IP address subscribed to by ARNOLD.

**COMPLAINT FOR FORFEITURE**

*18*

46.     Based on information from this investigation and conversations with other law enforcement knowledgeable about this investigation, SA Chin identified multiple pharmacies that provided fulfillment services for Pitcairn Group to include Budget Drugs, Alpha Pharmacy, Mail Meds, Pin RX, Sains Solutions, UCP and Kwic Fill, Inc. On September 12, 2005, the DEA Philadelphia, Pennsylvania office executed a search warrant at Budget Drugs pharmacy relative to filling illegal Internet drug orders for online pharmacy affiliate programs. Despite the DEA's shut down of Budget Drugs, Pitcairn Group continued their illegal Internet pharmacy operation and used UCP to fill Internet drug orders as evidenced by undercover purchases that the DEA San Francisco Field Division conducted through Pitcairn Group's Web sites that were filled and shipped from UCP. In addition, on March 8, 2006, the North Carolina Board of Pharmacy served an Order Summarily Suspending the permit of UCP for its participation in filling Internet drug orders. Subsequent to the shut down of UCP, Pitcairn Group began using Kwic Fill, Inc. to fill Internet drug orders. Kwic Fill, Inc. was started by individuals involved with United Care Pharmacy and identified as a sister pharmacy. On April 5, 2007, North Carolina Board of Pharmacy served an Order Summarily Suspending the permit of Kwic Fill, Inc. On the same date, DEA Greensboro, North Carolina executed an Administrative Inspection Warrant on Kwic Fill, Inc. As a result of the execution of the Administrative Inspection Warrant, Jeffrey Herholz (hereafter Herholz) voluntarily surrendered his DEA registration number for the operations of Kwic Fill, Inc.

47.     Pursuant to the execution of the Administrative Inspection Warrant, Herholz granted consent to DEA investigators to search his computer. An analysis of Herholz's computer, revealed multiple Skype chat sessions between Herholz and Skype username "pitcairn_inv". Based on information from this investigation and conversations with law

COMPLAINT FOR FORFEITURE

*19*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

information knowledgeable about this investigations, SA Chin identified Skype username "pitcairn_inv" as Pitcairn Investments, an additional name used by Pitcairn Group. In a Skype communication between Herholz and "pitcairn_inv", both individuals discussed Herholz obtaining larger quantities of drugs from wholesale distributors for "pitcairn_inv." They agreed their inability to get additional supply was not due to a lack of funding on their part, but was because they feared the large volumes ordered from the wholesale distributors would raise red flags. Herholz stated that if the distributors knew Kwic Fill, Inc. sold the drugs for online pharmacy affiliate programs, they would not sell to them. Herholz was advised by "pitcairn_inv" that they ("pitcairn_inv") did not care about the customers because affiliates were the most important aspect of the business. Herholz related how he (Herholz) could not place a single large order for drugs from a wholesale distributor if he (Herholz) wanted to stay in business. "Pitcairn_inv" advised that it was better to keep a low profile and to make a lot of money without getting any attention from the DEA. Subsequently, Herholz and "pitcairn_inv" discussed the possibilities of ordering additional quantities of drugs and remain under the radar.

48.     A financial investigation into the assets owned by ARNOLD revealed that ARNOLD purchased a 2004 Ferrari 575M Maranello on February 21, 2006 from Ferrari Beverly Hills. A review of the records from Ferrari Beverly Hills concerning the purchase of ARNOLD's Ferrari revealed an e-mail communication sent on February 17, 2006 from tech@pitcairn-inc.com to Ferrari Beverly Hills with the subject of "Address." The content of the e-mail communication was as follows:

Hi James!

This is Mike.
Please find the separate Registration and Contract address for FedEx below. The Title address is a little long, but all of the information is important for receipt.

COMPLAINT FOR FORFEITURE

Title/Registration Address:

    AMV Holdings, LLC
    1601 NW 97th Ave.
    PTY-11132 #025207
    Miami, FL 33102-5207

Fedex Address for Contract:

    Mike Arnold
    2234 N. Federal Highway #489
    Boca Raton, FL 33431

Thank you!

Mike

49.    An internal e-mail communication of Ferrari Beverly Hills, dated March 21, 2006, included a request by Ferrari Beverly Hills to send the title of the Ferrari to Mike ARNOLD at 2234 N. Federal Highway #489, Boca Raton, Florida. Ferrari Beverly Hills also requested to know the tracking number for the title package because the customer (ARNOLD) wanted to have the tracking number sent to him. SA Chin has identified 2234 N. Federal Highway #489, Boca Raton, Florida as a mail drop commonly used by ARNOLD as a method to conceal ARNOLD's residential address.

## ARNOLD'S INVOLVEMENT IN MONEY LAUNDERING ACTIVITIES

50.    Based on the undercover purchases conducted by the DEA San Francisco Field Division, analysis of wire transfer records and ARNOLD's bank accounts, it is believed that ARNOLD has engaged in a scheme to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. ARNOLD's scheme included the use of multiple offshore bank accounts, offshore shell corporations, layering of drug

COMPLAINT FOR FORFEITURE

proceeds through multiple bank accounts and the purchase of high value assets including jewelry and real property. The investigation has revealed that the offshore companies controlled by ARNOLD are Echo International, S.A., Direct Connect International, S.A., Haven Technologies, Inc., Azure Technology, S.A., Neptune Capital Management, S.A. and Pitcairn Investments Inc.

51. On February 27, 2006, DEA agents from San Francisco conducted an undercover purchase of ninety tablets of phentermine 37.5 mg, a schedule IV controlled substance, from Web site ezdietpills.net. Ezdietpills.net had been previously identified by DEA agents from previous undercover purchases and subpoena information as an Internet pharmacy Web site operated by Pitcairn Group. After completing the phentermine order, the DEA agents received an e-mail confirmation regarding the online order. The e-mail informed DEA agents that a charge on their credit card would be listed as echo-intl.com. In addition, the Web site ezdietpills.com stated that the charge on the credit card would be from Echo International, S.A.

52. Based on a Whois search and the analysis of the Web site echo-intl.com, SA Chin identified echo-intl.com as Echo International, S.A., which is a shell corporation utilized by Pitcairn Group and ARNOLD to establish an offshore merchant account for the purpose of receiving and distributing proceeds derived from the illegal sale of controlled substances. SA Chin's analysis of the wire transfer activity related to Echo International, S.A. revealed sixty-eight wire transfers in the amount of $9,991,308 that originated from Optimal Payments to Echo International, S.A. for the time period of June 2, 2005 through December 20, 2005. Optimal Payments is a Canadian-based credit card processing company that processed credit cards for Internet pharmacies.

53. After the drug proceeds were layered through the Echo International, S.A. account, SA Chin identified forty wire transfers for a total of $3,524,771.27 from the Echo

COMPLAINT FOR FORFEITURE

*22*

International, S.A. account to two Panamanian bank accounts held in the names of Direct

Connect International, S.A. and Haven Technologies, Inc.. An additional sixty-four wire

transfers totaling $7,780,085.50 sent from Echo International, S.A. to two Panamanian bank

accounts held in the name of Pitcairn Investments, Inc.. The Pitcairn Investments, Inc. accounts

were later used to further Pitcairn Group's illegal Internet pharmacy operation by dispersing

payments to physicians and pharmacies such as UCP and Kwic Fill, Inc. SA Chin further

identified thirty-one wire transfers from Pitcairn Investments, Inc. to UCP for a total of

$1,673,630.00 during the period of May 3, 2005 through November 29, 2005. SA Chin also

identified an additional eighteen wire transfers from Pitcairn Investments, Inc. to Kwic Fill, Inc.

for a total of $1,512,955.00 over the time period of January 13, 2006 through May 14, 2006.

54.    Further analysis of the offshore wire activity revealed that ARNOLD repatriated

the drug proceeds by sending wire transfers from offshore accounts including Direct Connect

International and Haven Technologies, Inc. to a Scottrade brokerage account held in the name of

Vsecure Networking, Inc. According to records from the Florida Secretary of State, Vsecure

Networking, Inc. was established by ARNOLD on May 2, 2001. Financial records reflect 116

wire deposits into ARNOLD's Vsecure Networking, Inc. Scottrade account for a total amount of

$3,489,527.46.

55.    Once the drug proceeds were deposited into ARNOLD's Vsecure Networking,

Inc. Scottrade brokerage account (xxxxx289), ARNOLD commingled the drug proceeds by

purchasing securities such as stock and mutual funds. ARNOLD then proceeded to layer the

drug proceeds by transferring all of the securities held in the Vsecure Networking, Inc. Scottrade

brokerage account (xxxxx289) to a personal Scottrade brokerage account (xxxxx642) held in the

name of ARNOLD. ARNOLD then wrote multiple checks made payable to himself and

COMPLAINT FOR FORFEITURE

deposited the checks into Mercantile Bank Checking account number (xxxxxx3273) held in the name of ARNOLD. After ARNOLD deposited the laundered proceeds into Mercantile Bank Checking account number (xxxxxx3273), ARNOLD conducted a series of electronic transfers between his Mercantile Bank Savings account number (xxxxxx4709). In total, SA Chin has traced $3,240,989.50 from Mercantile Bank Checking account number (xxxxxx3273) deposited into Mercantile Bank Savings account number (xxxxxx4709) in the name of ARNOLD. SA Chin has also traced multiple deposits totaling $2,745,026.00 from Mercantile Bank Savings account number (xxxxxx4709) into Mercantile Bank Checking account number (xxxxxx3273) indicating a circular flow of money between ARNOLD's Mercantile Bank accounts. A temporary transfer of funds between the same accounts is a commonly used method to layer and conceal illegal proceeds.

56.    SA Chin's financial analysis of ARNOLD's bank accounts also uncovered a scheme employed by ARNOLD, whereby ARNOLD purchased jewelry from a Boca Raton, Florida jewelry store known as Les Bijoux LLC with drug proceeds laundered through ARNOLD's Direct Connect International Panamanian bank account. These records revealed two wire transfers sent from Direct Connect International and two wire transfers sent from Haven Technologies, Inc to Les Bijoux LLC. SA Bridgers identified the bank where the Les Bijoux LLC account is held and conducted an interview of a bank representative concerning the transactions between ARNOLD and Les Bijoux LLC. The bank representative informed SA Bridgers that the bank had spoken with the owner of Les Bijoux LLC. The owner of Les Bijoux LLC stated that ARNOLD had purchased jewelry and wanted to return the jewelry for a full refund because he (ARNOLD) was getting ready to purchase a property. Prior to purchase of ARNOLD's residence, multiple wire transfers and checks were deposited into Mercantile Bank

COMPLAINT FOR FORFEITURE

Checking account number (xxxxxx3273) held in the name of ARNOLD from Les Bijoux LLC.

### a. Purchase of Defendant Real Property at 205 SE Spanish Trail, Boca Raton

57.     Currently, ARNOLD is the titleholder to the defendant real property, having 100% interest in the defendant real property.

58.     On December 18, 2006, ARNOLD purchased 205 SE Spanish Trail, Boca Raton, Florida for $8,950,000.00. The records obtained from Century Bank showed that ARNOLD made the down payment by depositing into escrow, the following wire transfers and cashier's check:

a)      on November 9, 2006, a wire transfer for $500,000.00 drawn from Mercantile Bank account (xxxxxx3273) of ARNOLD;

b)      on November 9, 2006, a wire transfer for $100,000.00 drawn from Mercantile Bank account (xxxxxx3273) of ARNOLD;

c)      on December 18, 2006, a wire transfer for $400,000.00 drawn from Mercantile Bank account (xxxxxx3273) of ARNOLD;

d)      on December 20, 2006, cashier's check #524634 for $2,900,000.00 drawn from Mercantile Bank account (xxxxxx3273) of ARNOLD.

59.     Mercantile Bank records for Checking account (xxxxxx3273) in the name of Michael ARNOLD showed that prior to the wire transfers and cashier's check  into escrow, this account received $6,268,026.00 in deposits from three separate sources (Les Bijoux LLC, Scottrade Brokerage account (xxxxxx5839) in the name of ARNOLD, Mercantile Bank Savings account (xxxxxx4709) in the name ARNOLD)  identified as part of ARNOLD's scheme to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

COMPLAINT FOR FORFEITURE

60.    The first source of deposits into Mercantile Bank Checking account (xxxxxx3273) consisted of three wire transfers totaling $745,000.00 from a bank account in the name of Les Bijoux LLC. In addition, Mercantile Bank Checking account (xxxxxx3273) received two check deposits totaling $300,000 drawn from a bank account in the name of Les Bijoux LLC. As previously discussed in paragraph 56, ARNOLD sent four wire transfers to Les Bijoux LLC totaling $801,910.00. Two of wires originated from a Panamanian bank account in the name of Direct Connect International and the other two wires originated from an additional Panamanian back account in the name of Haven Technologies, Inc. Both Direct Connect International and Haven Technologies, Inc. have been identified as foreign shell companies controlled by ARNOLD and entities used in ARNOLD's money laundering scheme.

61.    The second source of deposits into Mercantile Bank Checking account (xxxxxx3273) consisted of six check deposits drawn from Scottrade Brokerage account (xxxxxx5839) in the name of ARNOLD for a total of $2,682,500.00. As previously discussed in paragraph 32, Scottrade Brokerage account (xxxxxx5839) has been previously identified as a layering account utilized by ARNOLD in his money laundering scheme. SA Chin's analysis of the deposit activity in Scottrade Brokerage account (xxxxxx5839) reflects that the source of deposits as monies derived ARNOLD's Internet pharmacy operation and subsequently layered and integrated through ARNOLD's foreign bank accounts and domestic brokerage account.

62.    The third source of deposits into Mercantile Bank Checking account (xxxxxx3273) consisted of two electronic deposits from Mercantile Bank Savings account (xxxxxx4709) in the name ARNOLD for total a $2,540,526.00. As previously discussed in paragraph 32, Mercantile Bank Savings account (xxxxxx4709) was used by ARNOLD as a layering account to temporarily hold proceeds from Mercantile Bank Checking account

COMPLAINT FOR FORFEITURE

xxxxxx3273. SA Chin has traced the flow of proceeds between each of ARNOLD's Mercantile

Bank accounts through the analysis of all electronic transfer activity.

a)     on November 3, 2006, check #1649275 for $124,000.00 from Scottrade

       Brokerage account (xxxxxx5839) of ARNOLD.

b)     on November 8, 2006, a wire transfer for $420,000.00 drawn from a bank account

       of Les Bijoux LLC.

c)     on November 9, 2006, an electronic transfer for $100,000.00 from Mercantile

       Bank Savings account (xxxxxx4709) of ARNOLD.

d)     on November 10, 2006, a wire transfer for $100,000 drawn from a bank account

       of Les Bijoux LLC.

e)     on November 20, 2006, check #1666177 for $1,496,000.00 from Scottrade

       Brokerage account (xxxxxx5839) of ARNOLD.

f)     on November 22, 2006, check #1682504 for $538,500.00 from Scottrade

       Brokerage account (xxxxxx5839) of ARNOLD.

g)     on November 28, 2006, check #4746 for $130,000.00 from a bank account of Les

       Bijoux LLC.

h)     on November 30, 2006, personal check #1052 for $244,000.00 from Scottrade

       Brokerage account (xxxxxx5839) of ARNOLD.

i)     on December 5, 2006, personal check #1053 for $225,000.00 from Scottrade

       Brokerage account (xxxxxx5839) of ARNOLD.

j)     on December 7, 2006, personal check #1055 for $55,000.00 from Scottrade

       Brokerage account (xxxxxx5839) of ARNOLD.

k)     on December 7, 2006, check #4813 for $170,000.00 from a bank account of Les

Bijoux LLC.

l)     on December 13, 2006, an electronic transfer for $2,440,526.00 from Mercantile

Bank Savings account (xxxxxx4709) of ARNOLD

m)    on December 15, 2006, a wire transfer for $225,000 drawn from a bank account of

Les Bijoux LLC.

63.    SA Chin reviewed the settlement statement as well as the supporting

documentation that was prepared by ARNOLD to secure the Century Bank Mortgage loan for the

real property located at 205 SE Spanish Trail, Boca Raton, Florida. Specifically, he reviewed

two documents that were prepared by Montes and Meyvis Sanchez and on the letterhead for

Direct Connect International, S.A. and Azure Technology, S.A. According to the document

prepared by Montes, Direct Connect International, S.A. was identified as being a customer of

ARNOLD's vSecure Networking business. The letter was addressed to Complete Mortgage

Financing, Inc. And stated:

> Dear Chim,
>
> Please note that the wires sent in 2005 and 2006 to the Scottrade Account #
> 82801289 of vSecure Networking, Inc. were in payment for Technology
> Consulting Services and Commissions Invoices.
>
> The following invoices are outstanding and should be paid via Wire Transfer by
> Dec 8th, 2006.
>
> | | |
> |---|---|
> | 11/30/06 | $670,000.00 |
> | 12/05/06 | $350,000.00 |
> | 12/08/06 | $190,000.00 |
>
> We have worked with vSecure Networking since January 26th, 2005 and are
> extremely happy with the professional services provided.
>
> Sincerely,
>
> Juan Montes - President

**COMPLAINT FOR FORFEITURE**

64.    During this investigation, SA Chin learned that ARNOLD utilized the alias of "Juan Montes" in the operations of his drug enterprise. Based on information obtained through Internet keyword searches, SA Chin identified "Juan Montes" as an individual that worked as a law clerk at a Panamanian law firm that specialized in creating Panamanian corporations and performing asset relocations. Montes was identified as being in charge of the preparation of incorporations and post-incorporation documents. In addition, the majority of the Web sites that were controlled by ARNOLD were registered through the German-based Joker.com and registered in the name of Montes. The address listed for Montes was the same address as the Panamanian law firm in which Montes worked. Montes and Direct Connect International, S.A. were listed as the contact for at least one of ARNOLD's Web sites as early as January 2004. In addition, ARNOLD's e-mail address (tech@dcpanama.com) was listed as the registrants e-mail address as well as the technical, administrative and billing contact address.

65.    I reviewed the letter from Azure Technology, S.A. that was addressed to Complete Mortgage Financing, Inc. which revealed the following:

> Dear Ms. Francisco,
>
> This is a letter to confirm that Azure Technology, S.A. has hired the firm vSecure Networking, Inc. of Boca Raton, Florida to provide Technology Consulting for Implementation of Business Software and Order Processing Services for our company.
>
> The project will begin January 15th, 2007 and will last a period of 18-24 months. The monthly fee paid to vSecure Networking, Inc. will be approximately $225,000 US Dollars per month.
>
> Yours sincerely,
>
> Meyvis Sanchez - President
> Azure Technology, S.A.

**COMPLAINT FOR FORFEITURE**

*29*

66.    SA Chin reviewed the same Web site for the Panamanian law firm that Montes was employed and learned that Sanchez was in charge of preparing sales & purchase agreement, mortgage cancellations, follow up on constructions contracts and concession applications. It is believed the two referral letters from Montes and Sanchez were created for ARNOLD as a means to conceal the true nature, source and ownership of the funds for Direct Connect International, S.A. and Azure Technology, S.A.

## FIRST CLAIM FOR RELIEF

### 21 U.S.C. § 881(a)(6)

### (forfeiture of drug proceeds)

67.    Plaintiff incorporates by reference the allegations of paragraphs one through 66 as though fully set forth.

68.    Title 21, United States Code, Section 881(a)(6) provides, in part, for the forfeiture of all monies or other things of value furnished or intended to be furnished to be furnished by any person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all monies used or intended to be used to facilitate the distribution and possession with the intent to distribute a controlled substance., including violations of Title 21, United States Code, Sections 841, 843(b) and 846.

69.    In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the defendant real property represents moneys furnished or intended to be furnished to another person in exchange for a controlled substance, constitutes proceeds derived from such an exchange, and was used or intended to be used to facilitate an offense, in violation of Title 21, United States Code, Sections 841(a) and 846, and thus subject to forfeiture under Title 21, United States Code, Section 881(a)(6).

COMPLAINT FOR FORFEITURE

**SECOND CLAIM FOR RELIEF**

**18 U.S.C. § 981(a)(1)(A)**

**(forfeiture of property involved in violation of 18 U.S.C. § 1956(a)(1)(B)(i) - laundering of monetary instruments)**

70.     Plaintiff incorporates by reference the allegations of paragraphs one through 69 as though fully set forth.

71.     Title 18, United States Code, Section 981(a)(1)(A) provides, in part, for the forfeiture of any property, real or personal, involved in or traceable to a transaction or attempted transaction, in violation of Title 18, United States Code, Sections 1956 and 1957.

72.     Title 18, United States Code, Section 1956(a)(1)(B)(i) makes it unlawful to, knowing that the property involved in a financial transaction, represents the proceeds of some form of unlawful activity, conduct or attempt to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

73.     Title 21, United States Code, Section 841(a)(1) prohibits, in part, the distribution and possession with the intent to distribute a controlled substance. Sections 841(a) is a specified unlawful activities under Title 18, United States Code, Sections 1956(C)(7)(A) and 1961.

74.     Title 21, United States Code, Section, 846 prohibits a person from attempting or conspiring to distribute and possess with the intent to distribute a controlled substance. Section 846 is a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961.

75.     In light of the foregoing and considering the totality of the circumstances, the

**COMPLAINT FOR FORFEITURE**

*31*

defendant real property constitutes property involved in a violation of Title 18, United States

Code, Section 1956(a)(1)(B)(i) and thus is subject to forfeiture to the United States pursuant to

Title18, United States Code, Section 981(a)(1)(A).

**THIRD CLAIM FOR RELIEF**

**18 U.S.C. § 981(a)(I)(A)**

**(forfeiture of property involved in violation of 18 U.S.C. § 1956(a)(2)(B)(i)- international money laundering)**

76.    Plaintiff incorporates by reference the allegations of paragraphs one through 75 as though fully set forth.

77.    Title 18, United States Code, Section 981(a)(1)(A) provides, in part, for the forfeiture of any property, real or personal, involved in or traceable to a transaction or attempted transaction, in violation of Title 18, United States Code, Sections 1956 and 1957.

78.    Title 18, United States Code, Section 1956(a)(2)(B)(i) makes it unlawful for a person to transport, transmit or transfer, or attempt to transport, transmit or transfer a money instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, knowing that the monetary instrument or funds involved in transportation, transmission or transfer, represents the proceeds of some form of unlawful activity, and knowing that such transportation, transmission or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

79.    Title 21, United States Code, Section 841(a)(1) prohibits, in part, the distribution and possession with the intent to distribute a controlled substance, including MDMA. Sections 841(a) is a specified unlawful activities under Title 18, United States Code, Sections

**COMPLAINT FOR FORFEITURE**

1956(C)(7)(A) and 1961.

80.     Title 21, United States Code, Section, 846 prohibits a person from attempting or conspiring to distribute and possess with the intent to distribute a controlled substance. Section 846 is a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961.

81.     In light of the foregoing and considering the totality of the circumstances, the defendant real property constitutes property involved in a violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) and thus is subject to forfeiture to the United States pursuant to Title18, United States Code, Section 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

**(forfeiture of property involved in violation of 18 U.S.C. § 1957- engaging in money transaction in property derived from specified unlawful activity)**

82.     Plaintiff incorporates by reference the allegations of paragraphs one through 81 as though fully set forth.

83.     Title 18, United States Code, Section 981(a)(1)(A) provides, in part, for the forfeiture of any property, real or personal, involved in or traceable to a transaction or attempted transaction, in violation of Title 18, United States Code, Sections 1956 and 1957.

84.     Title 18, United States Code, Section 1957 prohibits one from knowingly engaging or attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

85.     Title 21, United States Code, Section 841(a)(1) prohibits, in part, the distribution and possession with the intent to distribute a controlled substance, including phentermine. Sections 841(a) is a specified unlawful activities under Title 18, United States Code, Sections

COMPLAINT FOR FORFEITURE

1956(C)(7)(A) and 1961.

86.     Title 21, United States Code, Section, 846 prohibits a person from attempting or conspiring to distribute and possess with the intent to distribute a controlled substance. Section 846 is a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961.

87.     In light of the foregoing and considering the totality of the circumstances, the defendant real property constitutes property involved in a violation of Title 18, United States Code, Section 1957 and thus is subject to forfeiture to the United States pursuant to Title18, United States Code, Section 981(a)(1)(A).

## PRAYER FOR RELIEF

88.     The United States has not seized the defendant real property. Rather, the United States will, as provided in Title 18, United States Code, Section 985(b)(1) and (c)(1):

a.     Post notice of this action and a copy of this Complaint for Forfeiture at the defendant real property;

b.     Serve notice of this action together with a copy of the Complaint for Forfeiture and related documents, on the owners of record of the defendant real property; and

c.     Record a *lis pendens* in the county records to demonstrate the status of the defendant real property in this *in rem* action.

Dated: July 27, 2007                              Respectfully submitted,

                                                  SCOTT N. SCHOOLS
                                                  United States Attorney


                                                  STEPHANIE HINDS
                                                  Assistant United States Attorney

**COMPLAINT FOR FORFEITURE**

1

**VERIFICATION**

2

I, JASON CHIN, states as follows:

3

4

    1.      I am a Special Agent for Drug Enforcement Administration.  I am familiar with

5

the facts in the investigation leading to the filing of this Complaint for Forfeiture.

6

    2.      I have read the Complaint for Forfeiture and based upon review of relevant

7

investigative reports, review of documentary evidence, discussions with other persons involved in

8

the investigation and participation in the investigation,  I believe that the allegations contained

9

10

therein are true.

11

    I declare under penalty of perjury that the foregoing is true and correct to the best of my

12

knowledge.

13

Executed this $\underline{27}$ day of July 2007, in San Francisco, California.

14

15

16

17

18

_____

19

JASON CHIN

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR FORFEITURE**