1    Edward W. Swanson, SBN 159859
     SWANSON, McNAMARA & HALLER LLP
2    300 Montgomery Street, Suite 1100
     San Francisco, California 94104
3    Telephone: (415) 477-3800
     Facsimile: (415) 477-9010
4

5    Attorneys for MICHAEL ARNOLD

6

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,          No. CV 07-03874 RMW

                Plaintiff,          **CLAIMANT MICHAEL ARNOLD'S**
12                                      **NOTICE OF MOTION AND**
       vs.                         **MOTION TO DISMISS**
13

14    REAL PROPERTY AND IMPROVEMENTS
     LOCATED AT 205 SE SPANISH TRIAL,
     BOCA RATON, FLORIDA            Date:    December 14, 2007
15                                     Time:    9:00 a.m.
                Defendant.        Court:   Ronald M. Whyte, Ctrm. 6
16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE**

Claimant Michael Arnold, who filed a verified statement as an interested party in this action on September 17, 2007, hereby moves this Court pursuant to FED. R. CIV. P. 12(b)(6) to dismiss the government's *in rem* Complaint For Forfeiture ("Complaint"), and hereby notices this motion for hearing on December 14, 2007, at 9:00 a.m.

This motion is made on the grounds that the government's Complaint fails to state a claim upon which this court can grant relief. Specifically, because the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, does not criminalize the conduct the government alleges in support of forfeiture, the complaint must be dismissed. This motion is based upon the instant notice of motion, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Edward W. Swanson, and upon argument presented at the hearing.

Dated: October 9, 2007                    Respectfully submitted,

_____/s/_____
Edward W. Swanson
SWANSON, McNAMARA & HALLER LLP
Attorneys for MICHAEL ARNOLD

1

## TABLE OF CONTENTS

2  Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

3  I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4  II.   Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5  III.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6  IV.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7       A.    In Adopting the CSA, Congress Did Not Intent to Impose Criminal
             Sanctions On the Basis of a Completely Standardless Federal Regulation . . . . . . 8

8

9             1)    Congress Never Intended To Adopt A Vague Federal Standard To
                   Supplant State Regulation Of The Practice Of Medicine. . . . . . . . . . . . . 10

10            2)    Congress Intended To Preclude Criminal Prosecutions Based On a
                   Vague "Standard" Such As That Contained in 21 C.F.R. §1306.04(a) . . 11

11

12            3)    The Attorney General's Interpretation Of The CSA Embodied In
                   21 C.F.R. § 1306.04 Is Entitled To No Deference. . . . . . . . . . . . . . . . . . 12

13            4)    The Interpretive Doctrine Counseling Avoidance Of Constitutional
                   Difficulties Supports Dismissal Because The Standard On Which The
14                 Government Alleges Criminal Conduct Underlying Forfeiture Is
                   Unconstitutionally Vague On The Facts Of This Case. . . . . . . . . . . . . . 13

15

16      B.    In Adopting the CSA, Congress Did Not Intend to Transform State
             Regulatory Violations into Federal Felonies. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

17  V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**STATUTES**

*Adamo Wrecking Co. v. United States*, 434 U.S. 275 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 18n.9

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Christensen v. Harris County*, 529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14n.7

*Colautti v. Franklin*, 439 U.S. 379 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Crandon v. United States*, 494 U.S. 152 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Crowell v. Benson*, 285 U.S. 22 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*
      485 U.S. 568 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Grenada County Supervisors v. Brogden*, 112 U.S. 261 (1884) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Harmelin v. Michigan*, 501 U.S. 957 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kansas ex rel. Stoval v. Confirmed.com, L.L.C.,* 38 P.3d 707 (Kan. 2002) . . . . . . . . . . . . . . . 16

*Oregon v. Gonzales*, 546 U.S. 243 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Solem v. Helm*, 463 U.S. 277 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Tanner v. United States*, 483 U.S. 107 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Donahue*, 948 F.2d 438 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Moore*, 423 U.S. 122 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1n.1, 7, 15

**STATUTES AND RULES**

18 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

21 U.S.C. § 821 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C. § 829 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 1n.1, 1n.2, 2, 15

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 871 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 257a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

42 U.S.C. § 290bb-2a (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

CAL. HEALTH & SAFETY CODE § 11153(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18n.8

FED. R. CIV. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FLA. STAT. § 893.02(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## REGULATIONS

21 C.F.R. § 291.505 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

21 C.F.R. § 306.04(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 C.F.R. § 1306.04(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 C.F.R. § 151.392 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 12n.6, 18n.8

42 C.F.R. § 8.1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## OTHER AUTHORITY

66 Fed. Reg. 4076 (Jan. 17, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

66 Fed. Reg. 21181 (April 27, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14n.7

66 Fed. Reg. 56,607 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

H.R. Rep. No. 1444, 91st Cong., 2d Sess., 1970 U.S.C.C.A.N. 4566 . . . . . . . 3, 4, 5, 6, 10, 11, 14

H.R. 4990 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10n.5

S. 3208 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10n.5

*Department of Health v. Rx Network*, Recommended Order, No.
DOH-0300343-FOF-MOA, 2003 WL 124675 (Fla.Div.Admin.Hrgs.) . . . . . . . . . . . . . . . . . 19

*Department of Health v. Rx Network*, Florida Board of Pharmacy Final Order,
No. DOH-03-0343-FOF-MOA (April 15, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 19n.10

Michael A. McCann, *Message Deleted? Resolving Physician-Patient E-Mail
Through Contract Law*, 5 Yale J. L. & Tech 3 (2002-2003) . . . . . . . . . . . . . . . . . . . . . . . . 16

1    MEMORANDUM OF POINTS AND AUTHORITIES

2    I.    INTRODUCTION

3    The Complaint alleges that Mr. Arnold participated in a "conspiracy" to distribute controlled

4    substances over the Internet. It does not allege he had anything to do with narcotics. It does not

5    claim he tried to pressure or circumvent the professional judgment of the licensed medical

6    practitioners with whom he worked. Instead, the government alleges that Mr. Arnold hired licensed

7    doctors to review medical questionnaires filled-out via the Internet in determining whether to

8    prescribe certain non-narcotic controlled substances and, if the doctors issued prescriptions,

9    facilitated fulfillment of the prescriptions by licensed pharmacists. According to the government's

10    theory, distribution of any controlled substances on the basis of prescriptions issued after Internet,

11    instead of face-to-face, consultations violates the general drug dealing provision of the CSA, 21

12    U.S.C. § 841 (and thus a related "conspiracy" violates § 846). However, the Complaint fails to

13    acknowledge the special position medical professionals occupy within the comprehensive regime

14    created by the CSA, under which doctors and pharmacists registered with the Attorney General are

15    permitted to distribute drugs pursuant to a prescription. That is the precise activity the complaint

16    alleges the medical professionals and their business partner, Mr. Arnold, engaged in here:

17    Distributing controlled substances pursuant to prescriptions issued by registered doctors and filled

18    by registered pharmacists. Consequently, in the plainest sense, the complaint fails to allege a federal

19    crime,[1] or to provide any basis for forfeiture.[2]

20

21

---

22    [1]    Of course, medical professionals who completely abdicate their duties and act as "drug pushers" are subject to prosecution under 21 U.S.C. § 841. *Oregon v. Gonzales*, 546 U.S. 243, 268

23    (2006); *United States v. Moore*, 423 U.S. 122, 126, 143 (1975) (permitting prosecution of doctor under 21 U.S.C. § 841(a), where the defendant had "concede[d] in his brief that he did not observe

24    generally accepted medical practices").

25    [2]    The Complaint comprises four claims for relief, one for forfeiture of drug proceeds and

26    three for forfeiture based on money laundering offenses. At the core of each rests the government's theory that distribution of controlled substances pursuant to a doctor's prescription

27    based on an Internet, rather than face-to-face, consultation violates 21 U.S.C. § 841. Thus, because the Internet pharmacy practice the Justice Department now disapproves does not violate

28    the CSA, the entire Complaint must be dismissed.

1    Nevertheless the government contends that because the medical professionals in this case

2    issued and filled prescriptions based on a doctor-patient relationship established via the Internet,

3    their distribution of medicine does not fall under § 841's exception (at 21 U.S.C. § 829) for

4    dispensing controlled substances pursuant to a "prescription." *See* Complaint at 12 ("no valid and

5    lawful prescription" without face-to-face meeting or consultation with a physician).   Thus, this case

6    poses a simple question:   Is it a federal felony to issue and fill prescriptions for non-narcotic

7    schedule III and IV controlled substances – primarily diet pills – on the basis of information

8    provided by patients via the Internet?

9    Unable to point to a federal *statute* criminalizing such conduct, the government turns to a

10   federal *regulation* requiring that prescriptions must be issued for a "legitimate medical purpose by

11   an individual practitioner in the usual course of his professional practice," 21 C.F.R. § 1306.04(a).

12   *See* Complaint, at 3-4.   According to the government, that *regulation* criminalizes prescriptions

13   issued on the basis of doctor-patient consultations conducted via the Internet.   That theory is

14   untenable.   However much the current administration may disfavor use of the Internet for issuing

15   and filling prescriptions, the Attorney General cannot, by regulation, criminalize conduct Congress

16   has not proscribed by statute.[3]

17   The government's theory grossly overreaches and overreads federal law.   The Attorney

18   General has no power to set federal standards for the practice of medicine, even in the area of

19   prescription drugs.   Just last year the Supreme Court held unequivocally that the Attorney General

20   has no "authority to declare an entire class of activity outside 'the course of professional practice,'

21   and therefore a criminal violation of the CSA."   *Oregon v. Gonzales*, 546 U.S. 243, 245 (2006)

22   (quoting 21 C.F.R. § 1306.04(a)).   The federal criminal drug statutes simply do not touch on the

23   conduct underlying the Complaint, and the reason is simple:   In adopting the CSA, Congress did not

24

25   _____

26   [3]    Moreover, in determining whether the Attorney General's application of a regulation
     faithfully implements congressional intent, the government's understanding of the statute is not
27   entitled to deference – in the criminal context implicated by the civil forfeiture at issue in this case,
     it is the courts that are charged with ensuring that individuals are punished only for conduct that
28   Congress intended to make criminal.

1   intend to criminalize such conduct.  Moreover, Congress has rejected each bill it has considered that

2   would have specifically limited prescriptions via the Internet.

3   Beyond the general impermissibility of relying on a regulation in derogation of

4   Congressional intent, both of the ways the government attempts to wrench the alleged conduct into

5   the realm of federal criminal law under § 1306.04 are impermissible.  First, the government suggests

6   that 21 C.F.R. § 1306.04(a) permits the Attorney General, and even individual federal prosecutors,

7   to set federal standards of permissible medical prescribing practice.  This is indefensible.  There is

8   simply no indication in the language or history of the statute that *Congress* intended federal rules

9   to govern the standards of medical professionals.  *See Oregon*, 546 U.S. at 272.  Moreover, if anyone

10  in the federal government were to establish medical prescribing standards under the CSA, it would

11  be the Secretary of Health and Human Services, not the inexpert Attorney General and his

12  underlings.  *See*, *e.g.*, *id.* at 265 ("The CSA allocates decisionmaking powers among statutory actors

13  so that medical judgments, if they are to be decided at the federal level and for the limited objects

14  of the statute, are placed in the hands of the Secretary.").  Finally, even if Congress had intended to

15  impose a federal standard and permitted the Department of Justice to articulate it, Congress

16  specifically *rejected* the possibility that a medical professional (and by extension, business

17  associates) could be subjected to criminal prosecution based on the kind of vague and standardless

18  "standard" embodied in Section 1306.04.[4]  *See* H.R. Rep. No. 1444, 91st Cong., 2d Sess., 1970

19  U.S.C.C.A.N. 4566, 4581 (Congress rejecting a Bureau of Narcotics regulation invalidating

20  methadone prescriptions issued "not in the course of professional treatment" because under this

21  standard "[t]he practicing physician has thus been confused as to when he may prescribe" and been

22  subject to criminal prosecution when the physician's "methods of prescribing narcotic drugs have

23  not conformed to the opinions of federal prosecutors of what constitutes *appropriate methods of*

24  *professional practice*.") (emphasis added); *see also Oregon*, 546 U.S. at 258 (phrase "legitimate

25  ―――――――――――――――――――

26  [4]      Moreover, the Due Process Clause of the Fifth Amendment prohibits criminal sanctions to
    rest on such vague terms.  The "standard" – even if it were duly enacted by Congress – is so vague
27  as to raise serious constitutional difficulties.  Accordingly, this Court should, at a minimum, invoke
    the canon requiring construction of statutes to avoid constitutional difficulties where possible, and
28  construe the CSA *not* to attempt to impose a standardless federal standard.

1   medical purpose" is a "generality, susceptible to more precise definition and open to varying

2   constructions, and thus ambiguous").

3       Second, the government appears to argue that the regulation's ban on issuing and filling

4   prescriptions outside "the usual course of professional practice" transforms a violation of *state* laws

5   (and even professional association guidelines) governing medical professional practices into a

6   federal felony. *See* Complaint at 4-6 (citing (1) non-criminal California provisions prohibiting

7   dispensation of "dangerous drugs" over the Internet without "good faith prior examination of a

8   human or animal for whom the prescription is meant"; (2) non-criminal North Carolina

9   administrative code provisions prohibiting pharmacists from filling prescription in the absence of

10  a "physical examination of the patient and in the absence of a prior prescriber-patient relationship").

11  Thus, the government relies on *state* rules, claiming that *they* set the parameters of medical

12  professional practice and thus define the "usual course of professional practice" for federal

13  regulatory and criminal purposes. This "incorporation of state rules" reading of Section 1306.04 is

14  plainly not a plausible construction of Congress's intent in adopting the CSA, and should be rejected

15  by this Court. *Oregon*, 546 U.S. at 264 (recognizing "obvious constitutional problems" in Attorney

16  General attempting to "authoritatively interpret State and local laws").

17      Because neither construction of the regulation is consistent with the language and structure

18  of the CSA or Congress's intent in adopting it, the Complaint fails to state a basis on which relief

19  can be granted, and this Court should dismiss the complaint.

20  **II.     STATUTORY AND REGULATORY BACKGROUND**

21      Congress enacted the CSA in 1970 to address a drug abuse "problem of ever-increasing

22  concern . . . approaching epidemic proportions." H.R. Rep. No. 1444, 91st Cong., 2d Sess., 1970

23  U.S.C.C.A.N. 4566, 4581; *see also Oregon*, 546 U.S. at 250. In identifying the "Extent of the

24  Problem," the House Report gave examples of specific causes for concern, such as "overdosage[s]

25  of heroin" among teenagers, growing marijuana use "among the young," and increasingly

26  widespread abuse of amphetamines and barbiturates. 1970 U.S.C.C.A.N. at 4572. To address these

27  and related concerns, the CSA created "schedules" of controlled substances, placing the drugs

28  named above (and other drugs with "high potential for abuse," 21 U.S.C. § 811) in Schedule I, and

other "controlled substances" categorized in schedules II-V according to their potential for abuse. The CSA grants the Attorney General (acting in concert with Department of Health and Human Services (HHS), *see, e.g.,* § 811(b)) the authority to add drugs to and remove them from these schedules. 21 U.S.C. § 811(a).

In addition to providing for the classification of controlled substances, the CSA establishes a system for the "registration of manufacturers, wholesalers, retailers, and all others in the legitimate distribution chain." 1970 U.S.C.C.A.N. at 4569. The statute accords the Attorney General authority "to promulgate rules and regulations . . . relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances and to the registration and control of registered persons and of regulated transactions." 21 U.S.C. § 821. The CSA also gives the Attorney General and his delegates authority to "promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions" under the statute. 21 U.S.C. § 871.

The CSA authorizes "registered" doctors to issue prescriptions and "registered" pharmacists to fill them. Regarding Schedule III and IV, substances such as those at issue here, the statute eschews detailed guidance and states only that "[e]xcept when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule III or IV, which is a prescription drug . . . may be dispensed without a written or oral prescription[.]" 21 U.S.C. § 829(b). In an apparent effort to elaborate that statutory provision, in 1973 the Attorney General promulgated the regulation on which the government bases its theory of the case:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription not issued in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning of . . . (21 U.S.C. § 829) . . . and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of law relating to controlled substances.

21 C.F.R. § 1306.04(a) (formerly 21 C.F.R. § 306.04(a)). Neither this regulation nor any other

explains how practitioners are to determine what is "a legitimate medical purpose" or whether

particular conduct is "in the usual course of . . . professional practice."

Significantly, in adopting the CSA, Congress specifically *rejected* exposing medical

professionals to criminal liability on the basis of vague terms almost identical to those contained in

21 C.F.R. § 1306.04(a). The suspect regulation, promulgated under the Harrison Act, purported to

govern the circumstances under which narcotics could be issued to drug addicts for treatment,

providing:

> An order purporting to be a prescription issued to an addict or habitual user of
> narcotics, *not in the course of professional treatment* but for the purpose of providing
> the user with narcotics sufficient to keep him comfortable by maintaining his
> customary use, is not a prescription within the meaning and intent of the [Harrison]
> Act; and the person filling such an order, as well as the person issuing it, may be
> charged with violation of the law.

26 C.F.R. § 151.392 (1970) (superceded by regulation) (emphasis added). Concerned with the

vagueness of the "not in the course of professional treatment" standard, the House Committee noted

that "[t]he practicing physician has thus been confused as to when he may prescribe[.]" 1970

U.S.C.C.A.N. at 4581. The Committee observed that prior to enactment of the CSA, doctors treating

narcotic addicts had sometimes been prosecuted on the ground that their "methods of prescribing

narcotic drugs ha[d] not conformed to the opinions of federal prosecutors of what constitutes

*appropriate methods of professional practice*." *Id.* (emphasis added). Although the Committee

expressed concern about the "appropriateness of having federal officials determine the appropriate

method of the practice of medicine," *id.*, it found that the danger of arbitrary prosecutions would

be minimized if *specific* regulations were enacted. Such regulations could help ensure that

physicians "will no longer jeopardize their professional careers by accepting narcotic addicts as

patients." *Id.*    Section 4 of Title I of the Act therefore directed the Secretary of the HHS

(then the Department of Health, Education, and Welfare) to issue regulations containing *detailed*

rules for the treatment of narcotic addicts. 42 U.S.C. § 257a (transferred to 42 U.S.C. § 290bb-2a

(2003)). In 1972, the Food and Drug Administration (FDA), a division of HHS, issued detailed

regulations. *See* 21 C.F.R. § 291.505 (1984) (replaced by a "new regulatory system" effective Mar.

19, 2001, *see* 66 Fed. Reg. 4076 (Jan. 17, 2001); 42 C.F.R. §§ 8.1 *et seq.* (2003)). No corresponding

1  regulations were ever issued regarding *non*-narcotic prescriptions such as those at issue in this case,

2  presumably because – at least until recently – government claims of criminality for the prescription

3  of non-narcotic drugs were virtually unknown.

4  **III.    STANDARD OF REVIEW**

5        Federal Rule of Civil Procedure Rule 12(b)(6) provides that a court shall dismiss a complaint

6  for "failure to state a claim upon which relief can be granted."  In resolving a 12(b)(6) motion,

7  allegations in the complaint are taken as true and construed in the light most favorable to the

8  nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 340 (9th Cir.1996).  A complaint

9  will not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in

10  support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46

11  (1957). However, "conclusory allegations of law and unwarranted inferences are insufficient to

12  defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136,

13  1140 (9th Cir.1996).

14  **IV.    ARGUMENT**

15        Mr. Arnold does not contend that medical professionals and the business associates with

16  whom they work cannot be prosecuted under 18 U.S.C. §§ 841 and 846.  On the contrary, doctors

17  and pharmacists who abandon their professional responsibilities and act as "drug pushers" cannot

18  escape criminal liability by virtue of their professional status. *Moore*, 423 U.S. at 143.  However,

19  the government may not use § 841 to target medical professionals and their associates simply

20  because prosecutors disagree with *how* medical professionals issue and fill prescriptions.  *Oregon*,

21  546 U.S. at 268-73.  That is exactly what the government is trying to do here.

22        While the Complaint fails to allege a specific theory of criminal liability under the relevant

23  *statute*, it contends that federal criminal penalties can be predicated on the vague and unknowable

24  standard articulated in a federal *regulation*, 21 C.F.R. § 1306.04(a), or possibly even that a violation

25  of state laws can somehow constitute a federal felony.  Neither theory is tenable.

26       \ \ \

27       \ \ \

28

1

2

**A.    In Adopting the CSA, Congress Did Not Intend to Impose Criminal Sanctions on the Basis of a Completely Standardless Federal Regulation.**

3    It is abundantly clear that the current Justice Department disdains use of the Internet in the

4    practice of medicine.  Congress, on the other hand, has not been so exercised by the practice of

5    Internet medicine, rejecting several bills to criminalize such conduct.  *See infra* note 5.  In the

6    absence of such a statute, no federal criminal law applies to medical professionals who issue and fill

7    prescriptions based on Internet consultations or the business associates with whom they work.  That

8    is the inescapable conclusion of the Supreme Court's recent decision holding that the Attorney

9    General (and his subordinates by extension) lacks the authority "to declare an entire class of activity

10   outside 'the course of professional practice,' and therefore a criminal violation of the CSA."

11   *Oregon*, 546 U.S at 245.

12   In *Oregon*, the Court addressed whether the CSA permitted the Attorney General to

13   prosecute doctors for engaging in prescribing practices with which he disagreed.  Specifically, the

14   Court considered a November 9, 2001, John Ashcroft Justice Department Interpretive Rule stating

15   that prescriptions of controlled substances to assist suicide were not issued for "a legitimate medical

16   purpose" within the meaning of 21 C.F.R. § 1306.04, and thus could subject prescribing doctors to

17   criminal penalties under the CSA.  *See* 66 Fed. Reg. 56,607, 56,608 (2001).  In concluding that the

18   CSA did not criminalize the conduct at issue, the Court emphasized that the CSA "manifests no

19   intent to regulate the practice of medicine generally." *Oregon*, 546 U.S. at 270.  Beyond Congress's

20   general intent to stay out of the business of medical oversight, the Court recognized that the

21   Attorney General is the wrong federal actor to make medical judgments, even when it comes to

22   prescribing controlled substances.  *Id.* at 265 ("The CSA allocates decisionmaking powers among

23   statutory actors so that medical judgments, if they are to be decided at the federal level and for the

24   limited objects of the statute, are placed in the hands of the Secretary [of HHS]."); *id.* at 266 ("The

25   structure of the CSA, then, conveys unwillingness to cede medical judgments to an Executive

26   official who lacks medical expertise."); *id.* at 264 ("It is quite a different matter, however, to say that

27   the Attorney General can define the substantive standards of medical practice as part of his

28   authority").  Finally, the Court reaffirmed the proposition that the Attorney General has no authority

to criminalize conduct *by regulation* that Congress has not made criminal *by statute*. *Id.* at 261 ("The Interpretive Rule thus purports to declare that using controlled substances for physician-assisted suicide is a crime, an authority that goes well beyond the Attorney General's statutory power to register or deregister."); *id.* ("The problem with the design of the Interpretive Rule is that it cannot, and does not, explain why the Attorney General has the authority to decide what constitutes an underlying violation of the CSA in the first place."); *id.* (Congress did not give the Attorney General, "just by implication, authority to declare an entire class of activity outside 'the course of professional practice,' and therefore a criminal violation of the CSA.").

The CSA, as interpreted by the Supreme Court, makes two things clear: The government may prosecute a doctor acting as a drug pusher, and the Department of Justice may not impose a federal medical standard based on its inexpert views regarding how medicine should be practiced. Here, the government is trying to do the latter.

Just as in *Oregon*, the government here attempts to define as criminal medical practices with which it disagrees. There, the Justice Department articulated its view of appropriate medical practices in a November 2001 Interpretive Rule; here, the government seeks to vindicate the standard for appropriate medical practice set out in an April 2001 Justice Department (DEA) Guidance, detailing its views on the prerequisites for establishment of a "bona fide doctor/patient relationship." *See* 66 Fed. Reg. 21,181 (Apr. 27, 2001). The Guidance approves a four-part test (assembled from state regulations with which it agrees) to determine a "legitimate doctor/patient relationship" for purposes of 21 C.F.R. § 1306.04(a). *See id.* at 21,182. According to the Guidance, "[c]ompleting a questionnaire that is then reviewed by a doctor hired by the Internet pharmacy could not be considered the basis for a doctor/patient relationship." *Id.*

Whatever these guidelines are, they are not an expression of Congress. Congress has not criminalized prescriptions issued on the basis of information obtained via the Internet, and the CSA does not confer that awesome power on the Attorney General.

\ \ \

\ \ \

### 1)    Congress Never Intended To Adopt A Vague Federal Standard To Supplant State Regulation Of The Practice Of Medicine.

Nothing in the CSA indicates that Congress contemplated an independent federal standard of medical care. On the contrary, the CSA "manifests no intent to regulate the practice of medicine generally." *Oregon*, 546 U.S. at 270. Given this congressional silence, and against the backdrop of decades of state regulation of this relationship, it is extremely unlikely that Congress intended the CSA implicitly to impose federal standards on the establishment of a doctor-patient relationship.[5]

It is particularly unlikely that Congress would have intended federal standards to govern a particular medical practice without saying so, when it *did* say so in the CSA itself on another issue. As noted above, Section 4 of Title I of the CSA directed the Secretary HHS to issue federal regulations establishing standards for the treatment of narcotic addicts. *See* 42 U.S.C. § 257a (transferred to 42 U.S.C. § 290bb-2a (2003)). The Committee Report on the version of the bill enacted explained that Congress was concerned that doctors treating narcotic addicts had sometimes been prosecuted because their "methods of prescribing narcotic drugs ha[d] not conformed to the opinions of federal prosecutors of what constitutes *appropriate methods of professional practice*." 1970 U.S.C.C.A.N. at 4581 (emphasis added). The Committee acknowledged that this was an area of doubtful federal authority, questioning the "appropriateness of having *federal* officials determine the appropriate method of the practice of medicine." *Id.* (emphasis added). Nonetheless, Congress found that a federal standard, embodied in *specific* regulations, was necessary so that physicians "will no longer jeopardize their professional careers by accepting narcotic addicts as patients." *Id.* Congress took the unusual step of requiring the federal government's principal health agency to promulgate regulations governing physician prescriptions of narcotics to addicts, and, accordingly the FDA issued detailed regulations. *See* 21 C.F.R. § 291.505 (1984).

This aspect of the CSA plainly demonstrates two principles animating adoption of the CSA. First, Congress doubted the wisdom of creating federal standards to regulate the practice of

---

[5]    Notably, to this day, to the extent that Congress has considered legislation expressly regulating the practice of issuing and filling prescriptions on the basis of Internet consultations, it has rejected such legislation. *See, e.g.,* S. 3208 (2000) (proposed amendment to Food, Drug, and Cosmetic Act that specifically addressed Internet prescribing); H.R. 4990 (2002) (requiring the name of the doctor and pharmacy to be prominently displayed on prescriptions).

medicine.   Second, Congress was capable of expressly stating when it intended (however grudgingly) that *federal* regulations define "appropriate methods of professional practice."  Congress took that extreme step in a specific circumstance *to protect medical practitioners from overzealous prosecution*, not to enable overzealous prosecution or civil forfeitures based on overbroad claims of criminality.

In construing Congress's intent, it is also significant that in *expressly* granting HHS authority to promulgate regulations relating to narcotics prescriptions, Congress acknowledged that it was, at a minimum, operating near the outer bound of its constitutional authority.  As noted above, the House Committee specifically questioned the "appropriateness" of federal regulation in this area. 1970 U.S.C.C.A.N. at 4581.  Given that fact, it is impossible to believe that Congress would have *implicitly* granted the Department of Justice authority to regulate the details of the doctor-patient relationship in cases of *non-narcotic* prescriptions.

### 2)   Congress Intended To Preclude Criminal Prosecutions Based On A Vague "Standard" Such As That Contained in 21 C.F.R. § 1306.04(a).

Even if this Court finds that Congress did intend to confer some authority on the Department of Justice to impose generally applicable federal standards on the practice of medicine, Congress specifically rejected the possibility that criminal liability could rest on a vague and standardless "standard."   Indeed, we are in the unusual situation of knowing for certain that Congress disapproved the vague "professional conduct" standard at issue here, because it did so expressly in adopting Section 4 of Title I of the CSA.  That section addressed the problem of prescription drugs prescribed for rehabilitating drug addicts.  Specifically, Congress sought to eliminate the unfair conditions doctors faced under a Bureau of Narcotics regulation containing a vague standard almost identical to that contained in 21 C.F.R. § 1306.04(a).  That regulation read:

> An order purporting to be a prescription issued to an addict or habitual user of narcotics, *not in the course of professional treatment* but for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use, is not a prescription within the meaning and intent of the [Harrison] Act; and the person filling such an order, as well as the person issuing it, may be charged with violation of the law.

26 C.F.R. § 151.392 (emphasis added) (superceded).  As discussed above, Congress disapproved the "not in the course of professional treatment" standard because it failed to provide doctors with

sufficient guidance on how to practice and subjected them to prosecution at the whims of federal prosecutors who disagreed with their methods of professional practice. Thus, Congress sought to avoid precisely the type of vague standard the government relies on here. In light of these arbitrary prosecutions, Congress concluded that *specific* regulations were needed so that physicians "will no longer jeopardize their professional careers by accepting narcotic addicts as patients." *Id.*

No similar *specific* regulations were ever issued regarding *non*-narcotic prescriptions, presumably because criminal prosecutions for the prescription of non-narcotic drugs were virtually unknown and unimaginable. Nonetheless, the government now seeks to apply a similarly vague standard – "usual course of professional practice" – to the issuance of plainly less dangerous *non-narcotic* prescriptions.[6] It is hard to imagine how a standard could be more unambiguously at odds with congressional intent.

**3)    The Attorney General's Interpretation Of The CSA Embodied
In 21 C.F.R. § 1306.04 Is Entitled To No Deference.**

The Attorney General may not make criminal conduct that Congress did not intend to be criminal. Moreover, in determining whether the Attorney General's regulations and applications thereof faithfully implement congressional intent, the government's understanding of the statute is not entitled to deference in the criminal context. As Justice Scalia has explained, "a criminal statute is not administered by any agency but by the courts." *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment). While the Department of Justice must "determine for itself what a statute means," the courts "have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference" in court. *Id.* Accordingly, regulations purporting to implement a criminal statute are not entitled to deference. In the specific context of the CSA, the *Oregon* Court concluded that the Attorney General's "interpretation of

---

[6]    In fact, to the extent the regulations differ, the rejected Bureau of Narcotics regulation provided more guidance. That regulation applied to only "a prescription issued to an addict or habitual user of narcotics." 26 C.F.R. § 151.392. To fall under its scope a prescription had to be issued not just outside "the course of professional treatment," but also "for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use." *Id.* By contrast, 21 C.F.R. § 1306.04(a) applies to all persons and provides no guidance beyond the unknowable "usual course of professional practice" term.

1   'legitimate medical purpose' does not receive *Chevron* deference," and any deference accorded his

2   interpretation must be "tempered by the Attorney General's lack of expertise in this area[.]"

3   *Oregon*, 546 U.S. at 269.

4           The core reason for declining to defer to Department of Justice constructions of criminal

5   statutes is because to do so would be inconsistent with the rule of lenity – also called the "rule of

6   strict construction" – under which the courts should resolve ambiguity in the meaning of criminal

7   statutes in favor of defendants, not the government. *See*, *e.g.*, *Crandon*, 494 U.S. at 158. The rule

8   of lenity is, of course, most applicable where (as here) the ambiguity concerns the scope of conduct

9   made criminal. *See*, *e.g.*, *Tanner v. United States*, 483 U.S. 107 (1987) (applying the rule of lenity

10  to determine that an alleged conspiracy to defraud a private company supervised by the federal

11  government did not necessarily constitute a conspiracy "to defraud the United States"). The *Oregon*

12  Court applied this general rule to the context of the CSA, stating that the Attorney General has no

13  "authority to declare an entire class of activity outside 'the course of professional practice,' and

14  therefore a criminal violation of the CSA." *Oregon*, 546 U.S. at 262.

15          In short, this Court – not the DOJ – is charged with determining whether Congress intended

16  to criminalize the conduct set forth in forfeiture complaint. Where it is *unclear* whether Congress

17  intended particular conduct to be criminal, it should not be.

           **4)   The Interpretive Doctrine Counseling Avoidance Of Constitutional
18              Difficulties Supports Dismissal Because The Standard On Which The
                Government Alleges Criminal Conduct Underlying Forfeiture Is
19              Unconstitutionally Vague On The Facts Of This Case.**

20          The "standard" contained in the regulation that the government claims renders Mr. Arnold's

21  actions criminal is unconstitutionally vague as applied to the facts of this case. While this provides

22  an independent basis for dismissal, to the extent doubt remains, the doctrine of avoidance of

23  constitutional difficulties provides further support that this Court should read the CSA to preclude

24  criminal prosecution based on §1306.04.

25          1.      At a minimum, the Due Process Clause requires that a criminal prohibition

26  "give a person of ordinary intelligence *fair notice* that his contemplated conduct is forbidden by the

27  statute." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979). A statute will also be unconstitutionally

28

vague if it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Here, the "legitimate medical practice"/"usual course of professional practice" standard is not really a "standard" at all – it gives practitioners essentially no guidance in drawing the line between innocent conduct and serious felonies. Congress recognized that in adopting the CSA. Thus, Congress rejected the "not in the course of professional treatment" standard, on the basis that "[t]he practicing physician has thus been confused as to when he may prescribe," 1970 U.S.C.C.A.N. at 4581, and prosecutors were bringing charges on the basis of their opinions about how medicine should be practiced. *Id.* (emphasis added). The Supreme Court recognized it, too. *Oregon*, 546 U.S. at 258 ("phrase 'legitimate medical practice' is a generality, susceptible to more precise definition and open to varying constructions, and thus ambiguous"). This is precisely the kind of "rule" (or lack thereof) disapproved in *Grayned*, where those enforcing the law are left to determine its meaning *ad hoc*.[7] *See* 408 U.S. at 358 n.8.

Of course, the fact that the government's attempt to define Mr. Arnold's actions as criminal under Section 1306.04(a) here would violate the constitutional prohibition against vague criminal statutes does not imply that the regulation is *facially* invalid and may *never* be properly (and constitutionally) applied to physicians and pharmacists. Mr. Arnold recognizes that some applications of the regulation have been upheld by the courts in criminal cases against medical practitioners, including in the United States Supreme Court. However, each of those cases involved narcotics or large-scale drug pushing, of the sort the CSA was adopted to combat. That there should be constitutional applications of a vague regulation is not surprising – physicians and pharmacists must understand that some conduct falls far outside of the "usual course of professional practice."

---

[7]     That, of course, is precisely what the Attorney General (acting through the DEA) purported to do in issuing a "notice" to provide "guidance" to practitioners concerning the use of the Internet for dispensing controlled substances. *See Dispensing and Purchasing Controlled Substances Over the Internet*, 66 Fed. Reg. 21181 (April 27, 2001). Clearly, however, such a document "lack[s] the force of law," *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), and cannot dispel vagueness concerns. Equally clearly, such "guidance," like the regulation it purports to construe, is not entitled to deference.

1   Acting as a "pusher" to supply narcotics to known addicts constitutes such conduct – it falls directly

2   within that range of conduct Congress intended to make criminal.  Defendants who have engaged

3   in such blatantly improper conduct cannot be heard to complain about vagueness.  As the Eighth

4   Circuit has explained, the Constitution tolerates greater vagueness in criminal statutes where the

5   underlying conduct is "*malum in se*."  *United States v. Donahue*, 948 F.2d 438, 441 (8th Cir. 1991).

6   "[O]ne does not have to be a rocket scientist to know that bank robbery is a crime, and the statute

7   merely makes *malum prohibitum* (and punishable in federal court) that which already is *malum in*

8   *se*."  *Id.* (dismissing defendant's vagueness claim in single sentence).

9        The *Moore* case provides an important contrast to this one.  Dr. Moore was convicted of

10   unlawful distribution and dispensation of methadone, a narcotic Schedule II controlled substance,

11   in violation of 21 U.S.C. § 841(a)(1).  *Moore*, 423 U.S. at 124.  The Court directly addressed

12   Congress's concern over the arbitrariness of prosecutions under the vague standard in place before

13   enactment of the CSA.  Recognizing that Congress's command to promulgate specific regulations

14   governing treatment of addicts was designed to prevent criminal prosecutions from turning "on the

15   opinions of federal prosecutors," the Court noted that Congress intended those physicians who

16   violate the new *specific* regulations to "remain subject to serious criminal penalties."  *Id.* at 144.

17   The Court then observed:  "In the case of methadone treatment the limits of approved practice are

18   particularly clear."  *Id.* at 144.  And, there, as the *Oregon* Court noted, "the defendant, who had

19   engaged in large-scale overprescribing of methadone, 'concede[d] in his brief that he did not observe

20   generally accepted medical practices.'"  *Oregon*, 546 U.S. at 269 (quoting *Moore*, 423 U.S. at 126).

21        The present case, however, is entirely unlike *Moore*.  Here, the government has not alleged

22   that the doctors involved with Mr. Arnold violated any specific set of federal regulations.  Nor has

23   it alleged Mr. Arnold had anything to do with narcotics or drugs carrying a street value.  Instead, the

24   government seeks forfeiture of Mr. Arnold's home because it claims he violated the Controlled

25   Substances Act because his businesses facilitated delivery of diet medicines prescribed by licensed

26   doctors and filled by licensed pharmacists on the basis of medical information gathered over the

27   Internet.  Unlike supplying narcotics to addicts, such a practice is not objectionable "in itself."  To

28   the contrary, the Internet may provide an important and socially desirable way to provide medical

services, including consultations leading to prescriptions for non-narcotic medications. *See, e.g., Kansas ex rel. Stoval v. Confirmed.com, L.L.C.,* 38 P.3d 707, 714 (Kan. 2002) (rejecting claim that practice of prescribing based on Internet consultation, rather than personal examination, violated state consumer protection act, and noting that Internet pharmacy gave greater information than conventional one and that computerized consultation was more in depth). The medical community is engaged in a debate regarding how to reconcile technological advancements, such as the Internet, with the traditional practice of medicine. *See generally* Michael A. McCann, *Message Deleted? Resolving Physician-Patient E-Mail Through Contract Law*, 5 Yale J. L. & Tech 3 (2002-2003). Under such circumstances, Congress never intended criminal liability to hang in the balance for those advocating the minority position. *See Oregon*, 546 U.S. at 268 (emphasizing limits on Attorney General's power to set medical standards even beyond the physician-assisted suicide setting, and rejecting notion that the Attorney General "could decide whether any particular drug may be used for any particular purpose, or indeed whether a physician who administers any controversial treatment could be deregistered"). The Constitution's prohibition against vague criminal laws likewise forbids application of a regulatory standard forcing physicians and pharmacists (and those with whom they associate) to practice at their peril. Accordingly, on the facts of *this* case – where the boundary between proper and improper conduct is unclear – the law requires greater precision than is supplied by Section 1306.04.

2.    As just discussed, in enacting the CSA, Congress specifically sought to preclude exposing medical professionals to criminal liability based on a vague "standard" almost identical to 21 C.F.R. §1306.04 because of its ambiguity and potential for prosecutorial abuse. The doctrine requiring courts to read statutes to avoid constitutional difficulties further supports the interpretation of the CSA to preclude finding criminal liability based on 21 C.F.R. §1306.04.

As the Supreme Court has indicated repeatedly, statutes should be construed to avoid constitutional difficulties where "fairly possible," *see, e.g., Crowell v. Benson*, 285 U.S. 22, 62 (1932), because the courts should not "lightly assume" that Congress intended to "infringe constitutionally protected liberties." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building &*

*Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *Grenada County Supervisors v. Brogden*, 112 U.S. 261, 269 (1884)).

Thus, Mr. Arnold need not prevail on a vagueness claim here. The vagueness problem arising from the application of Section 1306.04 in this case is but further evidence that the regulation – as applied on the facts of *this* case – is not a faithful implementation of Congress's intent in enacting the CSA. It is implausible that Congress intended to replace decades of state regulation with a federal standard. It is particularly implausible that Congress intended to do so without saying so. It is extraordinarily implausible that Congress would have implicitly authorized the *same* federal standard that it *rejected* elsewhere in the CSA. And it is staggeringly implausible that Congress would have done so in the face of the constitutional difficulty that would result.

**B.   In Adopting the CSA, Congress Did Not Intend to Transform State Regulatory Violations into Federal Felonies.**

Beyond its assertion that it can set federal medical standards under § 1306.04(a) that prohibit prescriptions issued on the basis of doctor-patient consultations conducted via the Internet, the government implies that the federal regulation somehow incorporates state rules governing the doctors and pharmacists and transforms violations of those rules into a federal felony. *See* Complaint at 4-6 (citing non-criminal California statutes and North Carolina administrative code provisions governing occupational licensing boards).

It is unclear how the government's cherry-picked state regulatory provisions defining professional medical practice are converted into a federal prescribing standard or acquire the force of federal penal law. The government does not make any effort to define which state regulations fall within the ambit of § 1306.04(a), and which do not. Instead, one is left to wonder which state rules and regulations governing medical professionals can underlie a federal drug felony. Basing federal criminal penalties and civil forfeiture on the selective enforcement of state rules governing medical professionals is yet another attempt by the Justice Department to arbitrarily punish those with whom it disagrees. The phrase "usual course of his professional practice" either means the "usual course" as defined by state rules or it does not – it cannot bear the construction "'usual course' as defined by those state rules that a federal prosecutor thinks are particularly important."

It is unclear whether Congress – if it plainly so intended – could authorize a federal rule transforming state violations into federal felonies.[8]  At a minimum, such an effort would likely raise serious questions under the Fifth and Eighth Amendments of the United States Constitution.  Federal felonies buried in state laws and administrative rules do not satisfy the "fair warning" requirement of the Due Process Clause.[9]  And serious federal penalties for such violations would likely fail the "gross disproportionality" test of the Eighth Amendment.  *See, e.g., Solem v. Helm*, 463 U.S. 277, 284 (1983); *Harmelin v. Michigan*, 501 U.S. 957 (1991) (establishing "gross disproportionality" standard).  Significantly, however, there is no need for this Court to address those issues here.  For it is obvious that in enacting the CSA, Congress could not plausibly have intended to criminalize the violation of state rules of medical practice.

The idea that Congress intended to criminalize violations of state rules is particularly far-fetched in the present context, where rules governing proper medical and pharmaceutical practice vary from state to state, and are often far from settled even within a particular state.  In 2003, the year the government claims the alleged conspiracy began, the Florida Department of Health ("Department") resolved a case against a Florida pharmacy that illustrates the point.  In *Department of Health v. Rx Network*, the Department charged Rx Network and pharmacist Gwyneth Gordon with violating the Florida statute requiring that prescriptions be "issued . . . in the course of professional practice," FLA. STAT. § 893.02(20) – the same standard on which the government relies here.  *See Florida Board of Pharmacy's Final Order, Department of Health v. Rx Network*, Recommended

---

[8]    Interestingly, one of the California provisions cited by the government is nearly identical to the standard specifically rejected by Congress in adopting the CSA.  *Compare* Complaint at 5 (citing California Health and Safety Code Section 11153(a)(2) ("an order for an addict or habitual user of controlled substances, which is issued not in the course of professional treatment or . . . for the purpose of providing the user with controlled substances, sufficient to keep him or her comfortable by maintaining customary use" is not a "legal prescription[]"), *with* 26 C.F.R. §151.392 (1970) (superceded) ("An order purporting to be a prescription issued to an addict or habitual user of narcotics, not in the course of professional treatment but for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use, is not a prescription within the meaning and intent of the [Harrison] Act").

[9]    Indeed, as Justice Powell explained in *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 290 (1978), even federal regulations may not give adequate notice of federal crimes.  It is far less likely that *state* regulations could do so.

1   Order, No. DOH-0300343-FOF-MOA, 2003 WL 124675 (Fla.Div.Admin.Hrgs.), attached as Exhibit

2   A to Declaration of Edward Swanson (hereinafter "Recommended Order").  The Department made

3   the claim that prescriptions issued on the basis of consultations conducted over the Internet were not

4   "in the course of professional practice," and that the patient profiles compiled on the basis of

5   Internet questions were "an inadequate basis for the prescriptions."  Recommended Order, at ¶ 11

6   (Exhibit A, at 4).  The ALJ rejected those claims under a clear and convincing standard, finding that

7   there was "[e]vidence that patient profiles [based on Internet questionnaires] were an adequate

8   source of medical information to consult before dispensing drugs."  *Id.*  The ALJ also emphasized

9   that it would be "problematic" to require Gordon to "independently determine the validity of the

10  patient-physician relationship" because standards used to determine the validity of that relationship

11  "differ from state to state."  *Id.* at ¶ 192 (Exhibit A, at 24).[10]   While the Board of Pharmacy

12  ultimately concluded that pharmacists have an independent duty to "be aware of or take into

13  consideration the rules and regulations" governing medical professionals prescribing drugs," Florida

14  Board of Pharmacy Final Order, No. DOH-03-0343-FOF-MOA (April 15, 2003) (affirming in part,

15  reversing in part, and modifying the ALJ's Recommended Order) (hereinafter "Final Order"), at ¶¶

16  18-20, (Exhibit B to Swanson Decl., at 10-11), the Board also recognized explicitly that the Florida

17  state rules governing Internet pharmacy practices were in flux.  *Id.* at ¶13 (Exhibit B, at 8) ("The

18  Board agrees with the ALJ . . . that the [unwritten] Board statement and subsequent proposed rule

19  [regarding Internet pharmacy practices] in and of themselves did not provide adequate notice to Rx

20  Network and Gordon of any general standard of professional or business practice for pharmacies and

21  pharmacists filling prescriptions over the internet.").  For the same reasons that the Florida ALJ

22  hesitated to impose even modest civil penalties on a pharmacist for issuing prescriptions based on

23

24  _____

    [10]      The ALJ did find Rx Network liable for 24 instances of dispensing excessive quantities of

25  controlled substances, but ruled that the violation was negligent rather than intentional.  *See*
    Recommended Order (Exhibit A, at 28).  Despite its authority to revoke the pharmacy's license

26  entirely, the ALJ imposed the minimum penalty of $1000 per instance, which was increased by the
    Florida Board of Pharmacy in its Final Order to $2000 per instance, or $48,000.  *Department of*

27  *Health v. Rx Network*, Florida Board of Pharmacy Final Order, No. DOH-03-0343-FOF-MOA (April

28  15, 2003), at ¶ 23 (Exhibit B, at 12).

**MICHAEL ARNOLD'S MOTION TO DISMISS**

1  allegedly inadequate Internet consultations, it is unimaginable that Congress intended to authorize
2  lengthy federal prison terms for such regulatory violations.

3      Florida's experience is hardly unique.  States have been wrestling with how to reconcile
4  traditional medical practice with technological advances.  While the government has chosen to
5  highlight medical regulations from California and North Carolina that arguably support its preferred
6  methods for establishing a doctor-patient relationship, during the course of the alleged conspiracy,
7  at least 20 states did not even have regulatory, let alone criminal, standards prohibiting practicing
8  Internet medicine.  This disparate treatment among the states underscores the irrationality and
9  unfairness of transforming state medical practice standards into federal criminal law *ad hoc*.
10  Whatever civil penalties and licensing discipline the licensed doctors and pharmacists with whom
11  Mr. Arnold associated may face, they cannot be held to answer to federal criminal charges at the
12  government's whim.  That rings even more true with respect to Mr. Arnold, who is not a medical
13  professional and not bound by those regulations.

14      In sum, Congress plainly did not intend the CSA to transform state medical practice
15  violations into federal felonies, and the Department of Justice therefore may not do so either.

16  **V.    CONCLUSION**

17      The Court should dismiss the government's forfeiture complaint for failure to state an
18  offense.

19

20  Dated: October 9, 2007                           Respectfully submitted,

21                                                      _____/s/_____
                                                        Edward W. Swanson
22                                                      SWANSON, McNAMARA & HALLER LLP
                                                        Attorneys for MICHAEL ARNOLD

23

24

25

26

27

28